UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-13123-RGS

MANSON BROWN

v.

JOSEPH PEPE and CURTIS CINELLI

MEMORANDUM AND ORDER ON DEFENDANT CINELLI'S
MOTION FOR JUDGMENT ON THE PLEADINGS

September 8, 2014

STEARNS, D.J.

In this civil rights lawsuit, inmate Manson Brown alleges that defendants Department of Correction (DOC) Lieutenant Joseph Pepe and Massachusetts State Police Trooper Curtis Cinelli forced him to submit to an unconstitutional perp walk[1] while being extradited to Massachusetts from Georgia after being arrested as an escapee. Brown claims violations of his Fourth, Eighth, and Fourteenth Amendment rights. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985. Trooper Cinelli now moves for judgment on the pleadings.

---

[1] The "perp walk" is a "police practice . . . in which the suspected perpetrator of a crime, after being arrested, is 'walked' in front of the press so that he can be photographed or filmed." *Lauro v. Charles*, 219 F.3d 202, 203 (2d Cir. 2000).

## BACKGROUND[2]

Brown, a convicted felon, escaped from DOC custody in Massachusetts on November 27, 2009.[3] He was recaptured in Decatur, Georgia, on January 5, 2010. On January 12, 2010, Lt. Pepe and Trooper Cinelli arrived at the Dekalb County Jail to take custody of Brown to return him to Massachusetts. Before leaving the jail, Pepe and Cinelli placed Brown in hand and leg restraints. They then brought him to an area of the jail where several sheriff's deputies were milling about. While there, Cinelli used the camera of his cell phone to take a "selfie" with Brown, "like [Brown] was a 'prize catch.'" Am. Compl. ¶ 11.

Pepe and Cinelli then escorted Brown through the doors of the main lobby of the jail, rather than through a secluded side sally port, to an area where a gaggle of news media had assembled. Seeing the news cameras,

---

[2] For purposes of evaluating the motion for judgment on the pleadings, the court accepts as true the factual allegations of Brown's Amended Complaint (Dkt. # 10). *See Zipperer v. Raytheon Co., Inc.*, 493 F.3d 50, 53 (1st Cir. 2007) ("[T]he facts contained in the pleadings [are viewed] in the light most favorable to the nonmovant and [the court] draw[s] all reasonable inferences in his favor.").

[3] When he escaped, Brown was serving a 10-year sentence for home invasion. *See Brown v. Pete [sic]*, 2013 WL 141671, at *1 n.2 (D. Mass. Jan. 8, 2013). Additional indictments for home invasion and rape were pending against Brown. *Id.* Following his escape, DOC placed Brown on its "Most Wanted" list. *Id.*

Brown attempted to cover his head with the hood of his sweatshirt. Cinelli pulled the hood back to expose Brown's face. When Brown then tried to duck to shield himself from view, Cinelli and Pepe pulled him back up to face the cameras. Brown growled to the officers, "[Y]ou ain't gonna get your shine off me." *Id.* ¶ 12.

Brown alleges that he suffered "extreme humiliation, intense discomfort and emotional distress" from being publicly displayed in this fashion.[4] Pl.'s Opp'n at 2 (Dkt. # 38). He first brought suit against Pepe, Cinelli, and Sherriff Thomas Brown of Dekalb County, Georgia, in this court on September 10, 2012. *See Brown v. Pepe*, No. 12-cv-11687 (D. Mass. 2012) (*Brown I*). Because Sheriff Brown was not a resident of Massachusetts and the incident which formed the basis of the Complaint occurred in Georgia, pursuant to 28 U.S.C. § 1391(b),[5] the court (Sorokin,

---

[4] In opposing Cinelli's statute of limitations argument, *see* note 16, *infra*, Brown contends that he did not fully appreciate the fact that he had been injured until June of 2012.

[5] Under 28 U.S.C. § 1391(b), a civil action may be brought in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

3

M.J.) determined that the Northern District of Georgia was the proper venue for the lawsuit. *See Brown v. Pepe*, 2013 WL 3246127, at *3 (D. Mass. June 25, 2013). *Brown I* consequently was dismissed without prejudice, pursuant to 28 U.S.C. § 1406(a).[6] *Id.,* at *3-4, *Report and Recommendation adopted*, 2013 WL 3786464, at *1 (D. Mass. July 17, 2013) (Tauro, J.).

On November 12, 2013, Brown filed a second complaint in the Northern District of Georgia, this time omitting Sheriff Brown as a defendant. *See Brown v. Pepe*, No. 13-cv-03751 (N.D. Ga. 2013) (*Brown II*). On Brown's motion, the Georgia court transferred *Brown II* to this district in December of 2013, pursuant to 28 U.S.C. § 1404(a). Because all of the defendants named in *Brown II* reside in this district, venue in Massachusetts is now proper. *See* Dkt. # 2 at 2-3, *citing* 28 U.S.C. § 1391(b)(1).

## DISCUSSION

---

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

[6] The claims against Pepe were also dismissed for failure to exhaust administrative remedies. *Brown I*, 2013 WL 3246127, at *2. Brown asserts without elaboration that he has since exhausted such administrative remedies as are available to him. *See* Am. Compl. ¶ 7.

4

To impose liability under section 1983, Brown must demonstrate that "(1) [] the conduct complained of was committed by a person acting under the color of state law; and (2) [that] this conduct deprived [him] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989), *quoting Parratt v. Taylor,* 451 U.S. 527, 535 (1981), *overruled on other grounds, Davidson v. Cannon,* 474 U.S. 344 (1986). Cinelli does not contest that he was acting in his capacity as a Massachusetts State Police Trooper at all times in his dealings with Brown, but contends that he is entitled to qualified immunity because he did not violate any of Brown's "clearly established" constitutional rights.

Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Mitchell v. Forsyth,* 472 U.S. 511, 528 (1985) (officers immune unless their actions were "clearly proscribed" by established law). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The line

properly drawn is not between the constitutional and the unconstitutional, but between acts that, although unconstitutional, are nonetheless objectively reasonable, and acts that are unconstitutional on their face. *See Cox v. Hainey,* 391 F.3d 25, 31 (1st Cir. 2004). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Rivera v. Murphy*, 979 F.2d 259, 263 (1st Cir. 1992), *quoting Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (*per curiam*).

In assessing a qualified immunity defense, a court may choose to "first determine whether the plaintiff has alleged a deprivation of an actual constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). The "threshold" question in this mode of analysis can be stated as follows: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The Supreme Court had previously identified a particular value in this order of procedure. "Deciding the constitutional question before addressing the qualified immunity question . . . promotes clarity in the legal

standards for official conduct, to the benefit of both the officers and the general public." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). *Saucier* elevated this "benefit" into a mandate under which lower courts were *always* obligated to answer the constitutional question before asking whether the right asserted was "clearly established" law. However, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court backed away, acknowledging that "[t]here are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking." *Id.* at 239. There are cases "in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Id.* A trial court, in other words, is at liberty to proceed in the sequence that seems most appropriate to the facts of the case at hand. *Id.* at 242. Here, the court will take up the arguably "more difficult question" or whether Brown has alleged a constitutional violation at all.[7]

---

[7] The court notes, however, that because there is no clearly established law in Massachusetts or the First Circuit giving guidance on the constitutionality of a perp walk, the result would be reached very quickly under a "clearly established law" analysis. The court chooses the more difficult approach because of the value of establishing such guidance, a benefit which this case has the potential of achieving.

The constitutionality of the so-called "perp walk" is a matter of first impression in this Circuit. Brown's principal argument is based on an alleged violation of his Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. Amend. IV.[8] Brown does not contend (nor could he) that he was not lawfully in Pepe's and Cinelli's custody, but rather that his voice and likeness was captured and memorialized against his will, in violation of his right to privacy (no matter how diminished by the fact of lawful custody).[9]

Cinelli does not contest that the Fourth Amendment encompasses seizures of intangibles such as video footage and photographic images. *See Caldarola v. Cnty. of Westchester*, 343 F.3d 570, 574 (2d Cir. 2003) ("Although [i]t is true that . . . at one time . . . th[e] [Fourth] Amendment was thought to limit only searches and seizures of tangible property . . . .

---

[8] "[A] seizure deprives the individual of dominion over his or her person or property." *Horton v. California,* 496 U.S. 128, 133 (1990).

[9] This case is distinguishable from *Lauro*, in which the Second Circuit found a staged perp walk to violate the Fourth Amendment. In *Lauro*, police learned of media interest in Lauro's case subsequent to his arrest for burglary. They then chose to reenact the arrest to gain news coverage by taking Lauro out of the police station, driving him around the block, and bringing him back into the station. *Lauro*, 219 F.3d at 204-205. Although the Court acknowledged that "[t]he interests of the press, and of the public who might want to view perp walks, are far from negligible . . . that interest is not well served by an *inherently fictional dramatization* of an event that transpired hours earlier." *Id.* at 213 (emphasis added). Brown makes no claim in his Amended Complaint that his perp walk involved any "reenactment" of his arrest.

[t]he premise that property interests control the right of the Government to search and seize has been discredited.") (internal quotation marks omitted), *citing Katz v. United States*, 389 U.S. 347, 352-355 (1967). However, "*Katz* teaches that Fourth Amendment protection extends only to situations in which the complaining person had a reasonable and legitimate expectation of privacy." *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 10 (1st Cir. 1975) (quotation marks and citation omitted). "The reasonableness of an individual's expectation of privacy will vary in accordance with the circumstances of a given seizure." *Caldarola*, 343 F.3d at 575.

In *Caldarola*, several corrections officers employed by the DOC of the County of Westchester, New York, were arrested on suspicion of fraudulently obtaining disability benefits. *Id.* at 572. The Second Circuit found that video footage taken of the arrested officers being transported to a police car through the DOC parking lot, where the video was "intended [by the arresting officers] for public viewing by television audiences," constituted a Fourth Amendment seizure. *Id.* at 574-575. The Court noted that, although "[o]ne's privacy interests receive much less protection in public places," *id.* at 575, "an accused [nonetheless] possesses a privacy interest in not being 'displayed to the world, against his will, in handcuffs, and in a posture connoting guilt.'" *Id.*, *quoting Lauro*, 219 F.3d at 212 n.7.

9

In Brown's case, the perp walk occurred at the main entrance of the Dekalb County Jail. Like the DOC parking lot in *Caldorola*, the venue was one over which Brown had no dominion, nor, as an area open by right to the public, could he reasonably expect the exclusion of journalists and cameras from the vicinity simply because of his presence. *See Caldarola*, 343 F.3d at 575. Thus, as in *Caldorola*, Brown had only a "minimal" expectation of privacy in the circumstances of his perp walk. *See id.*[10]

Although it cannot be gainsaid that the media's recording of Brown's voice and image intruded on his legitimate concerns for privacy, the seizure was nonetheless reasonable when balanced against the government interests served by the publication by the news media of the visual verification of his extradition. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Determining whether . . . a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."); *see also Terry*

---

[10] Cinelli's privately-taken photograph of Brown stands on a somewhat different footing. Brown was lawfully in Cinelli's custody, and Brown's image was in "plain view" to Cinelli. Brown had no reasonable expectation that Cinelli would not view his visage or hear his voice. There is no allegation that Cinelli disseminated or published the "selfie" taken with Brown. At most the "selfie" amounts to a *de minimis* intrusion on Brown's privacy that does not implicate constitutional concerns.

*v. Ohio*, 392 U.S. 1, 21-22 (1968). In *Caldarola*, the Court identified the several governmental interests favoring the publication of the video of the arrests in that case.

> The County created and distributed the videotape to inform the public about its efforts to stop the abuse of disability benefits by its employees. The fact that corrections officers – public employees – were arrested on suspicion of grand larceny is highly newsworthy and of great interest to the public at large. Divulging the arrests also enhances the transparency of the criminal justice system, and it may deter others from attempting similar crimes. Furthermore, allowing the public to view images of an arrestee informs and enables members of the public who may come forward with additional information relevant to the law enforcement investigation.

*Caldarola*, 343 F.3d at 576.[11] The Court concluded that, "[b]ecause there was a minimal expectation of privacy in the parking lot, and the conduct of the arresting officers did not unreasonably exceed the scope of what was necessary to effectuate the arrest and to otherwise serve legitimate government purposes," there was no *unreasonable* seizure under the Fourth Amendment. *Id.* at 577.

Cinelli identifies two additional governmental interests at play in publication of footage of Brown's extradition: "1) to inform the public that a dangerous escaped felon has been taken back into custody; and 2) to

---

[11] The Court also noted that "videotape can also be used to serve the legitimate government purpose of protecting individuals from police abuse and protecting police from false accusations of abuse." *Id.* at 576 n.3.

11

dissuade other would be fugitives from attempting to escape by sending the message that no matter how far you run the government will pursue and find you." *Cinelli Br.* at 11 (Dkt. # 27). These interests are all the more compelling when the subject is an escaped felon convicted of (and facing charges of) serious crimes of violence than (as in *Caldarola*), the arrest of persons whose guilt had yet to be adjudicated. Brown's escape had made him the subject of a national man-hunt as well as national media coverage on "America's Most Wanted."[12] In addition to raising safety concerns over a convicted criminal at-large, Brown's flight also called into question the effectiveness of minimum security prisons, as well as the competence and accountability of prison officials responsible for Brown's safekeeping and the guarding of public safety.[13] Weighing the "minimal" intrusion on Brown's privacy against these significant government interests, it is clear

---

[12] *See* http://www.myfoxboston.com/story/17765596/escaped-massachusetts-convict-manson-brown-captured-in-georgia (accessed August 29, 2014).

[13] *See* http://www.boston.com/news/local/massachusetts/articles/2009/12/02/fenceless_prisons_defended_after_latest_escape (accessed August 29, 2014).

12

that there was no unreasonable Fourth Amendment seizure in the taping of his perp walk.[14]

Brown also alleges a violation of the Eighth Amendment prohibition against cruel and unusual punishments. "[R]epugnant to the Eighth Amendment [are] punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-103 (1976) (internal quotation marks and citations omitted). Unnecessary and wanton inflictions of pain are those "totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (punitive use of a hitching post). *See also Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) (use of a stun gun to enforce compliance with a simple housekeeping order was "unnecessary and wanton"); *DeSpain v. Uphoff*, 264 F.3d 965, 977-979 (10th Cir. 2001) (same, gratuitous discharge of pepper spray); *Williams v. Benjamin*, 77 F.3d 756, 764-765 (4th Cir.

---

[14] "Whether the government purposes served by creating and distributing the videotape would have alternatively been served or served as well by a press conference without the controversial videotape are questions we need not answer. It is unnecessary for us to inquire into the alternative means by which the police could achieve the same goals, so long as the method used is constitutional, as it is here." *Caldarola*, 343 F.3d at 577.

1996) (refusing to allow a restrained prisoner to wash chemical mace from his eyes). The court discerns nothing in the facts of this case that come anywhere near satisfying the *Estelle* standard. Consequently, there is no cognizable violation of the Eighth Amendment.

Finally, Brown claims that his Fourteen Amendment right to due process was violated because he was presented in the media with hand and leg restraints "in a posture connoting guilt," while indictments against him were still pending.[15] *Lauro*, 219 F.3d at 212 n.7. "[R]eputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). Brown does not allege that his extradition from Georgia to Massachusetts was procedurally deficient, or that the perp walk had a prejudicial impact on the outcome of his [then] pending indictments. Without identifying some protectable tangible interest adversely affected by the perp walk, Brown's due process claim fails as well. In sum, because defendants' conduct in this

---

[15] Brown, as an admittedly convicted felon and escapee, was not in the same position as a person arrested before an adjudication of guilt, to whom the presumption of "innocent until proven guilty" attaches with full force.

case does not amount to a violation of Brown's constitutional rights, Brown has failed to allege a viable claim under section 1983 or section 1985.[16]

---

[16] Cinelli is also entitled to judgment on the pleadings as a matter of law because Brown's Complaint was filed outside the statute of limitations. For limitation purposes, section 1983 claims are "best characterized as personal injury actions," *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), and "borrow the statute of limitations applicable to personal injury actions under the law of the forum state." *Street v. Vose*, 936 F.2d 38, 39 (1st Cir. 1991).

*Brown II* was filed three years and ten months after the complained-of perp walk, which is indisputably beyond the two-year statute of limitations for personal injury actions in Georgia, *see* Ga. Code §9-3-33, and the three-year statute of limitations in Massachusetts. *See* Mass. Gen. Laws ch. 260, § 2A. *Brown I* was filed two years and eight months after the perp walk, well after the expiration of the Georgia limitations period, but within the Massachusetts limitations period. Massachusetts law permits the refiling of a timely-instituted action within one year of dismissal for "any matter of form." Mass. Gen. Law ch. 260, § 32. Whether *Brown II* is a viable refiling turns on whether *Brown I* is subject to the Georgia or Massachusetts limitations period.

*Brown I* is governed by the Georgia statute of limitations because at the time of its filing, venue was proper only in Georgia. Although *Brown I* was dismissed rather than transferred under section 1406, the alternative outcome would not impact the applicable statute of limitations. Where a transfer is (or would have been) made for improper venue, the transferee court (and not the transferor) court's law governs. *See Davis v. Louisiana State Univ.*, 876 F.2d 412, 413 (5th Cir. 1989) (where venue for a section 1983 action was improper, the statute of limitations of the state of the transferee court applies); *see also Meyer v. Callahan*, 2010 WL 4916563, at *1 n.3 (D.N.H. Nov. 29, 2010) ("While the First Circuit has not addressed this issue, many circuits hold that – unlike a transfer pursuant to § 1404(a) – a transfer under § 1406(a) mandates the application of the transferee's choice-of-law rules. *See, e.g., Trierweiler v. Croxton & Trench Holding*

## ORDER

For the foregoing reasons, Cinelli's motion for judgment on the pleadings is <u>ALLOWED</u>. The Clerk will enter judgment for defendants[17] and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

*Corp.,* 90 F.3d 1523, 1532 (10th Cir. 1996); *Manley v. Engram,* 755 F.2d 1463, 1470 (11th Cir. 1985); *Nelson v. Int'l Paint Co.,* 716 F.2d 640, 643 (9th Cir. 1983); *Ellis v. Great Sw. Corp.,* 646 F.2d 1099, 1103-[11]11 (5th Cir. 1981); *Renyo v. Piper Aircraft Co.,* 630 F.2d 149, 165 (3d Cir. 1980), *rev'd on other grounds,* 454 U.S. 235 (1981); *Martin v. Stokes,* 623 F.2d 469, 472-[4]73 (6th Cir. 1980). By making his transfer to New Hampshire pursuant to §§ 1406(a) and 1631, District Judge Jonker determined that the District Court of Michigan was an improper venue for the suit. *See* 28 U.S.C. § 1406(a). Therefore, the plaintiff should not be afforded the application of an improper venue's choice-of-law rules.").

Policy considerations also dictate this outcome. Because section 1983 claims borrow the statute of limitations of the forum state, a plaintiff should not be able to avoid the shorter statute of limitations of the proper forum state by instituting an action in a state with a longer limitations period.

[17] The rationale of this decision applies with equal force to Pepe, who has made a limited appearance in this litigation to seek dismissal of the Amended Complaint against him on the independent ground of insufficiency of service. *See* Dkt. # 39. Consequently, he will be dismissed from the Complaint as well.